**James Earl YOUNG**

v.

**James MABRY, Commissioner, Arkansas Department of Correction.**

**No. PB–C–77–104.**

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

Dec. 7, 1978.

Wayne Zakrzewski, Little Rock, Ark., for petitioner.

Catherine Anderson, Asst. Atty. Gen., Little Rock, Ark., for respondent.

## MEMORANDUM OPINION

ROY, District Judge.

This action is before the Court on a petition for habeas corpus relief filed pursuant to 28 U.S.C., Sec. 2254.

On April 2, 1970 petitioner James Earl Young and his wife, Doris Jean Young, were charged by information filed in Pulaski County Circuit Court, State of Arkansas, with the crime of possession of stolen property in violation of Ark.Stat.Ann. Sec. 41–3938 (Repealed). Petitioner was charged in that same information with being a habitual criminal offender, in violation of Ark.Stat.Ann. Sec. 43–2328 (Repl. 1977), alleging he had previously been convicted of at least five felonies. The causes were severed and petitioner was tried and convicted on May 24, 1972, and a thirty-one year penitentiary sentence was imposed.

The conviction was affirmed on appeal to the Arkansas Supreme Court, see *Young v. State, 254 Ark. 72, 491 S.W.2d 789 (1973)* and petitioner's subsequent motion before that Court for post-conviction relief was denied by per curiam order issued July 2, 1976.

Petitioner thereafter sought relief in federal district court by filing, on April 21, 1977, pro se motions for habeas corpus relief and for permission to proceed *in forma pauperis,* the latter request having been granted and counsel appointed to represent him in these proceedings.

With petitioner appearing represented by his court-appointed attorney, on June 8, 1978 a full scale evidentiary hearing was held before the Honorable Terry L. Shell, who took the matter under advisement after setting a schedule for briefs to be submitted to the Court. Unfortunately, Judge Shell's death on June 25, 1978 intervened prior to his determination of the merits of this case. However, petitioner's counsel did comply with the dates as set by Judge Shell and on June 29 submitted a post-trial brief. On July 17, 1978, at the request of this Court, petitioner's attorney indicated by letter that petitioner was agreeable to having the case decided on the basis of the record made at the June hearing.

In the meantime, petitioner filed two pro se motions for writs of mandamus with the United States Court of Appeals for the Eighth Circuit, both of which were denied on June 22 and August 30, 1978 respectively. In the Order entered the latter date, the Eighth Circuit Court of Appeals directed the United States District Court to order the respondent/State of Arkansas to file its post-trial brief and to indicate whether it was in agreement that disposition of the case could be made on the record made at the previous hearing. In compliance with this directive, this Court, having been assigned the case subsequent to Judge Shell's death, entered the indicated Order on September 5, 1978, which resulted in a request for another full scale evidentiary hearing by the State of Arkansas. In light of this request, the Court informed the Assistant Attorney General representing the respondent that its brief could be submitted after the second hearing as a post-trial brief as had been previously ordered. However, the State submitted what became, in light of the foregoing events, a pre-trial brief on September 14, 1978, and a full scale evidentiary hearing was held before this Court on September 15, 1978, as previously scheduled.

Because of matters raised in respondent's pre-trial brief and at the evidentiary hearing, petitioner's counsel requested additional time to respond thereto and asked to present additional evidence, if necessary, at a continuation hearing. In accordance with this request, the record was left open for ten days. However, both counsel were able to stipulate as to certain evidentiary matters with the stipulations filed on October 19, 1978, and becoming part of the record of the September evidentiary hearing. Both sides were permitted to, and have submitted supplemental and reply briefs, respectively, and the record is now closed as to evidentiary matters and for purposes of further argument.

In addition to the formal pleadings and briefs filed by the attorneys of record, petitioner submitted a pro se pleading styled "A Letter Requesting to Dismiss The Proceedings" which was filed in open court at the September hearing. Although, as alleged therein, certain briefing dates were not met by respondent, this Court finds that, in light of the subsequent events from the date of the June hearing, petitioner has not suffered any prejudice because of that delay nor because a second evidentiary hearing was held in this case.

The sudden and tragic death of our colleague, Judge Shell, caused the trial docket assigned to him to be held in abeyance while at the same time created an awesome and tremendous caseload for the district judges sitting in the Eastern District of Arkansas. At the time of his death, Judge Shell had several matters under advisement and besides reassigning these cases for determination, procedures had to be implemented for notification as to whether the

parties desired rehearings or were in agreement that decisions could be rendered on the records previously made. The Court formulated the policy that if one party requested a rehearing, such request would be followed.

Petitioner's cause of action was heard by this Court as if no previous hearing had been held. This has resulted in this Court having the advantage of hearing the testimony of the witnesses in open court instead of reviewing the same from the cold record, as well as giving the attorneys the opportunity to present fresh legal arguments buttressed by any factual averments which may have come to light subsequent to the June 8 hearing.

Furthermore, had it become necessary for this Court to render its decision from the record of the previous hearing, it would have been necessary to get a transcript of those proceedings which would have further delayed ultimate disposition. The Assistant Attorney General who represented respondent at the September hearing was not the same as counsel at the June hearing. It would have been impossible for her to submit a post-trial brief until she had an opportunity to review the transcript of the previous hearing.

■ In view of all these circumstances, this Court is unable to say that petitioner has suffered any prejudice as a result of any technical non-compliance by the State or as a result of a second hearing on the merits. Therefore, petitioner's motion to dismiss is denied.

In his initial pro se petition, petitioner raised three points which he alleged entitle him to habeas corpus relief. After an extensive evidentiary hearing and from the arguments in the briefs submitted by counsel, Point One appears to be the only area of major contention between the parties. This Court feels, however, that all three points should be discussed and decided for a full disposition of this case. Both attorneys have favored the Court with excellent and exhaustive briefs on all three points, and there is little dispute as to the factual developments of this case. The following memorandum opinion constitutes this Court's findings of fact and conclusions of law in accordance with Rule 52, Fed.R. Civ.P.

### I.

Petitioner first alleges that he should be granted relief under his habeas corpus petition because the State of Arkansas failed to comply with the speedy trial provisions imposed under the Interstate Agreement on Detainers Act, Ark.Stat.Ann. Sec. 43–3201 et seq. (Repl.1977) (hereinafter referred to as the IAD or the Agreement), and as a result his correlative protected constitutional rights to a speedy trial and due process have been violated. It is this contention that has given the Court the most serious concern.

The chronological series of events can be ascertained from the transcript of the state proceedings as supplemented by the evidentiary hearing and stipulation entered of record. State criminal charges were filed against petitioner on April 2, 1970, but because several continuances were granted, (mostly at the request of petitioner and because of, in one instance, his failure to appear on the date set for trial), and other pretrial delays,[1] he was not brought to trial

---

1. In order to present a more concise picture of the legal history of this case, the following calendar of events is set forth for reference:

 April 2, 1970—Information filed against petitioner;

 April 7, 1970—Case passed to the May setting;

 May 5, 1970—petitioner appeared with his attorney, Louis W. Rosteck, and entered plea of not guilty; case set for trial before the Court for September 23, 1970;

 September 18, 1970—petitioner appears with attorney and case passed to the October setting to be reset, on motion of the petitioner;

 October 5, 1970—both petitioner and his wife appeared with their attorney, their cases were consolidated and set for jury trial for January 29, 1971;

 January 29, 1971—on motion of petitioner, his case was passed to the March setting to be reset;

 April 5, 1971—Louis Rosteck relieved as attorney for petitioner, and Omar Greene sub-

until over two years later. The relevant interim events for purposes of the speedy trial claim commence with the date of July 29, 1971 when petitioner began serving a federal sentence at the United States Penitentiary in Atlanta, Georgia. On September 29, 1971, the State of Arkansas lodged a detainer against the petitioner as notification to the federal institution in which he was incarcerated at the time that he was wanted to face pending criminal charges in this State.

Petitioner alleges that on October 4, 1971, while incarcerated in Georgia, he filed a pro se petition for a speedy trial on the charges pending against him in Arkansas. He was unable to substantiate this allegation by documentary evidence at the hearing, but he did testify that he took his pro se petition to his parole officer, asked him to notarize it and mail it to the proper authorities in Arkansas. Attached as Exhibit C to the Stipulation is a copy of what appears to be this notice petition, for it is a pleading styled Petition for Speedy Trial or Dismissal wherein defendant James Earl Young states there has been no attempt to bring him to trial on the state criminal charges of possession of stolen property. This pleading was notarized on October 4, 1971 by the caseworker at the United States Penitentiary in Georgia. Also attached as Exhibit C is petitioner's accompanying affidavit which is stamped RECEIVED, Oct. 8, 1971, PROSECUTING ATTORNEY. These two documents entered into the record pursuant to the Stipulation establish that the Office of the Prosecuting Attorney for Pulaski County, Arkansas received "notice" of petitioner's request for speedy trial on October 8, 1971. From the face of these documents it is apparent, however, that they were never filed in the office of the Circuit Clerk for Pulaski County nor made a part of the record in the state proceedings.

The state record is void as to the events that transpired thereafter but it appears that no effort was made by the State of Arkansas authorities to bring petitioner to trial until May 1, 1972, when, in the custody of the United States Marshal, petitioner appeared before the Pulaski County Circuit Court, First Division.[2] Although petitioner has maintained that he was not represented by counsel before this date, the state record reflects that his court-appointed counsel was relieved that date and substitute counsel appointed. On May 1, trial was set on the criminal charges for May 3, 1972, but the case was passed by agreement and consent of petitioner on May 2nd, to May 16, 1972, at which time petitioner appeared with his attorney and the case was again passed to May 24, 1972. Jury trial was subsequently had on this latter date and petitioner found guilty as charged.

The Interstate Agreement on Detainers Act, *supra*, to which Arkansas is a party state, is an interstate compact the purpose of which as stated in Article One is to encourage the expeditious and orderly disposition of criminal charges pending against a prisoner incarcerated outside the "demanding" jurisdiction in which the criminal charges are pending. The relevant section of the Agreement upon which petitioner bases his claim under Point One is Article III, which is set forth in full as follows:

stituted as counsel; case set for jury trial for June 29, 1971;
June 29, 1971—severance granted by the Court; petitioner failed to appear for trial and alias warrant issued for his arrest;
July 29, 1971—petitioner began serving sentence in the United States Penitentiary in Atlanta, Georgia;
September 29, 1971—detainer lodged against the petitioner by the State of Arkansas;
October 4, 1971—petitioner files pro se motion for speedy trial;
October 8, 1971—petitioner's pro se motion received in Pulaski County Prosecuting Attorney's office;

May 1, 1972—petitioner appears in Pulaski County Circuit Court with attorney Omar Greene, who is relieved of counsel, and Guy Jones, J., appointed to defend petitioner; trial set for May 3, 1972, but passed by agreement and consent of petitioner to May 16, 1972, at appearance on May 2;
May 16, 1972—prosecutor and defense attorney appear in state court and by agreement, case is passed to May 24, 1972 for jury trial;
May 24, 1972—petitioner tried and convicted of state criminal charges.

2. The record reflects that petitioner was out on a writ to the State of Arkansas from April 19, 1972 until May 27, 1972.

## ARTICLE III

(a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other part [party] state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred eighty [180] days after he shall have caused to be delivered to the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint; provided that for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner.

(b) The written notice and request for final disposition referred to in Paragraph (a) hereof shall be given or sent by the prisoner to the warden, commissioner of corrections or other official having custody of him, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested.

(c) The warden, commissioner of corrections or other official having custody of the prisoner shall promptly inform him of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition of the indictment, information or complaint on which the detainer is based.

(d) Any request for final disposition made by a prisoner pursuant to Paragraph (a) hereof shall operate as a request for final disposition of all untried indictments, informations or complaints on the basis of which detainers have been lodged against the prisoner from the state to whose prosecuting official the request for final disposition is specifically directed. The warden, commissioner of corrections or other official having custody of the prisoner shall forthwith notify all appropriate prosecuting officers and courts in the several jurisdictions within the state to 'which the prisoner's request for final disposition is being sent of the proceeding being initiated by the prisoner. Any notification sent pursuant to this paragraph shall be accompanied by copies of the prisoner's written notice, request, and the certificate. If trial is not had on any indictment, information or complaint contemplated hereby prior to the return of the prisoner to the original place of imprisonment, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

(e) Any request for final disposition made by a prisoner pursuant to Paragraph (a) hereof shall also be deemed to be a waiver of extradition with respect to any charge or proceeding contemplated thereby or included therein by reason of Paragraph (d) hereof, and a waiver of extradition to the receiving state to serve any sentence there imposed upon him, after completion of his term of imprisonment in the sending state. The request for final disposition shall also constitute a consent by the prisoner to the production of his body in any court where his presence may be required in order to effectuate the purposes of this agreement and a further consent voluntarily to be returned to the original place of imprisonment in accordance with the provisions of this agreement Nothing in this paragraph shall prevent the imposition of a concurrent sentence if otherwise permitted by law.

(f) Escape from custody by the prisoner subsequent to his execution of the request for final disposition referred to in Paragraph (a) hereof shall void the request.

18 U.S.C. Appendix; Ark.Stat.Ann. Sec. 43–3201 (Repl.1977).

Petitioner specifically claims that the State of Arkansas failed to bring him to trial on the pending criminal charges within the 180 days as is allegedly mandated by the Agreement.

In computation of the 180-day period, however, there is no contention by petitioner that the period intervening between May 3, 1972 to May 24, 1972 should be used in the calculations, inasmuch as this delay was incurred by his agreement and consent. Furthermore, petitioner has apparently conceded that the initial starting date for the computation is the date the notice was *received* by the proper State authorities, and not the date notice was *filed*. In any event, whether it is the filing date (October 4, 1971 to May 3, 1972 equals 211 days) or the date of receipt (October 8, 1971 to May 3, 1972 equals 207 days), it is clear that either time period exceeds the 180-day limit set in Article III, *supra*, using May 3, 1972, the initial trial date, as the end of the statutory period.

Critical to the disposition of this issue is a 33-day period during which petitioner was absent from the federal institution in Georgia on a writ to the Eastern District of Arkansas where he was tried on federal criminal charges filed against him in that jurisdiction. From February 20 to March 24, 1972, he was incarcerated in the Pulaski County Jail. Petitioner contends that since he was physically present within the demanding jurisdiction he was not unable to stand trial on the state criminal charges within the meaning of Article VI of the Agreement. However, if this 33-day period tolls the running of the time limit set forth in Article III, as urged by the respondent, then the legal requirements set forth in the Agreement have not been violated.

## A.

It initially appears to this Court that the petition for habeas corpus relief has, for jurisdictional purposes, been properly filed in this forum pursuant to 28 U.S.C. Sec. 2254 since it is clear from the pleadings that petitioner is confined under a state court judgment and commitment order, all available remedies at the state level have been exhausted and the grounds stated in the petition contain sufficient factual allegations for this court to pass on the question of whether he is in custody in violation of his federal constitutional rights. Furthermore, it appears that the parties are in agreement that a claim brought under the IAD creates rights which may be raised in a petition for habeas corpus relief filed in federal court.

It is always incumbent, however, on a federal court to examine its own jurisdiction, see Rule 12(h)(3), Fed.R.Civ.P. and *Mansfield, C. & L. Ry. v. Swan, 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884)*.

At the time of the series of events giving rise to this cause of action, both the State of Arkansas (Ark.Stat.Ann. Sec. 43–3201, *supra*, Acts. 1971, No. 705) and the United States (18 U.S.C.App.; Pub.L. 91–538, Secs. 1–8, Dec. 9, 1970) were party jurisdictions to the Interstate Agreement on Detainers Act as reflected by their respective codifications.[3] Whenever so enacted, the Agreement becomes binding on at least two sovereigns and rights arising thereunder flow from the joint actions of both party jurisdictions. *United States ex rel. Esola v. Groomes, 520 F.2d 830 (3d Cir. 1975)*. The provisions of the Agreement are ". . . triggered only when a 'detainer' is filed with the custodial (sending) State by another State (receiving [or demanding]) having untried charges pending against the prisoner; . . . ." *United States v. Mauro, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978)*.

---

**3.** There are slight variations in these respective codifications but these differences are not material to the disposition of this case.

■ In the instant case, the State of Arkansas (demanding state) lodged a detainer against the petitioner while he was in federal custody and incarcerated in a United States Penitentiary located at Atlanta, Georgia. The United States therefore became the sending jurisdiction and as held in *U. S. ex rel. Esola v. Groomes, supra,* and tracking the language therein, a claim by a prisoner in federal custody arising under Ark.Stat.Ann. Sec. 43–3201 as it operates in conjunction with the federal enactment of the Agreement, is a claim arising under the laws of the United States, within the meaning of 28 U.S.C., Sec. 2254. It is of no consequence that the State of Georgia was not a party to the Agreement during the time of the operative facts (Code of Ga. Annotated, Ch. 77–5B, adopted April 3, 1972) since that State was never a custodial state within the meaning of the Act. *Cf., Beebe v. Vaughn, 430 F.Supp. 1220 (D.Del.1977),* wherein it was held that federal district court had jurisdiction of a habeas corpus action arising under the Agreement where both sovereign jurisdictions were member states, and the federal government was not a party to the action.

### B.

■ To ascertain the commencing date which triggers the limitation mechanism contained in Article III of the Agreement, the Court must first look to the plain language of that section as well as to any case law which has interpreted its construction. Article III(a) clearly states once the prisoner has caused to be delivered notice of place of confinement and request for final disposition, trial must follow within 180 days thereafter. To be effective, the notice must be given to the prosecuting authorities within the demanding jurisdiction and must also satisfy certain formal prerequisites as contemplated by Article III(a).

In at least two jurisdictions, allegations were raised similar to those urged by petitioner herein and interpretive decisions were rendered as to a determination of a proper request for speedy disposition so as to put the prosecuting authorities on notice and trigger the running of the statutory time period. In *Beebe v. Vaughn, supra,* the district court rejected petitioner's argument that compliance with the spirit of the law was sufficient. As to the notice requirements contemplated by Article III, there the district court stated:

> The Agreement provides a three step process by which both the interests of the inmate and the interests of the charging State may be furthered. First, the official who has custody of an inmate is required to inform the inmate of the existence of any detainer and of his or her rights under the IAD to request final disposition of the underlying charges. The inmate is then required to notify *the custodian* that he or she wishes a final disposition of the charges. The custodian then forwards the inmate's request, along with a certificate stating the terms of the present commitment, the time remaining to be served, the amount of good time earned and information regarding parole eligibility of the inmate, to the State that has placed the detainer.

> With the receipt of that formal request, the charging state is put on notice that it has 180 days to bring the defendant to trial. * * *

*Id.* at 1223. The court held the 180-day period provided by the Interstate Agreement on Detainers did not begin to run until the charging state received the notification required by the Agreement.

Likewise, the prisoner in *Williams v. State of Maryland, 445 F.Supp. 1216 (D.Md. 1978)* was held to have failed to satisfy the notice prerequisite since he had failed to have mailed the certificate of the terms of his incarceration and because he personally contacted only the court and not the state attorney's office. As stated therein: "The notice provision of the IAD was obviously enacted to ensure adequate notification to the state, and its particulars may not be ignored totally. . . . A prisoner seeking to benefit from the statutory provisions must first meet the burden of compliance with the Act." *Id.* at 1220.

The referenced document in the instant case, Exhibit C, which is Petitioner Young's request, is not accompanied by any certificate apprising the prosecuting authorities of the periods of his incarceration or any of the other information required to be contained in a formal notice. However, no issue has been made at any point in this litigation that the formal requirements of notice were not satisfied by petitioner. Although this Court could easily find from the record that Petitioner Young has failed to comply with the formal steps for notice, it will not do so and summarily find Point One without merit. In order to prevent any prejudice to petitioner, disposition of Point One should be made on the remaining issues raised therein.

As to the initial issue of the commencing date for the running of the 180-day period, the Court is satisfied that the plain language of Article III, as well as the fair and reasonable construction thereof in *Beebe v. Vaughn, supra,* leads to the conclusion that the date of *receipt* of notice by the prosecuting authorities triggers the statutory period. The key word in the statutory language is "delivered" and comporting with the purpose of the notice provision, the term would have little meaning if something other than the *receipt* of the notice were contemplated, inasmuch as the State authorities are bound to act within 180 days toward bringing the prisoner to trial in the receiving jurisdiction and abrogate the uncertainties of the pending charges against the prisoner.

### C.

■ Using the date of receipt as the starting point, October 8, 1971, the 180-day limit under Article III expired on April 5, 1972, unless the 33-day period during which petitioner was in the Eastern District of Arkansas facing criminal charges is an excludable period which tolled the running of the statute.

Article VI(a) of the Agreement provides: (a) In determining the duration and expiration dates of the time periods provided in Articles III and IV of this agreement, the running of said time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction in the matter.

The critical language in this passage of the Agreement is "unable to stand trial" and, as noted in the briefs, interpretive authority as to their legal construction is scant. However, at least two district courts have had occasion to pass on the tolling issue and have indicated in those decisions that the statutory time limits should be tolled during those periods when a prisoner is removed from the custodial place of incarceration and taken to another jurisdiction, other than the demanding jurisdiction, to stand trial on charges pending there.

In *United States v. Mason, 372 F.Supp. 651 (N.D.Ohio 1973)* it was held that the only logical result was to toll the running of the time period for 148 days while the defendant was transferred to a third state to stand trial, even though while originally incarcerated in the sending state he had notified the receiving state.

The prisoner in *Stroble v. Egeler, 408 F.Supp. 630 (E.D.Mich.1976) rev'd 547 F.2d 339 (6th Cir. 1977),* was taken from the sending jurisdiction to the receiving jurisdiction to stand trial on two sets of criminal charges but was brought to trial while there on only one series of the charges within the statutory time limit, allegedly a violation of Article IV of the Agreement. The district court held that the petitioner therein was "unavailable" for trial on the second set of charges, within the meaning of Article VI, since he was preparing for the first trial although he was physically present within the jurisdiction where the second set of charges were pending.

The Court of Appeals for the Sixth Circuit, in remanding the case to the district court, directed that an evidentiary hearing be held to determine whether the continuances granted at the second trial were for good cause shown and after notification with the prisoner and his counsel present. The district court was further directed to determine whether such non-compliance, if

any, resulted in prejudice to the prisoner, and if not, whether any non-prejudicial violation of the IAD mandated a new trial or dismissal of the indictment.

These two decisions were rendered by federal courts sitting in the Sixth Circuit and are limited persuasive authority to this Court in light of factual distinctions in the case at bar. Neither a federal court sitting in the Eighth Circuit nor the Arkansas Supreme Court has had occasion to pass on this issue.

This Court is not unaware of that part of the Stipulation which outlines the general procedure whereby state authorities can obtain the presence of a prisoner held in federal custody for purposes of standing trial in state court. Nor is this Court unmindful of the fact that Petitioner Young was incarcerated in the Pulaski County Jail during the time he was standing trial on the federal charges pending in the Eastern District of Arkansas.

Because of the multitude of complexities inherent in securing and coordinating the transfer of prisoners from one jurisdiction to another for purposes of trial, the decisions rendered by the federal district courts in *Stroble v. Egeler, supra,* and *United States v. Mason, supra,* reach the only tenable and realistic result which works to minimize the potential for confusion, while at the same time making sure that the rights of a prisoner facing multiple charges in two or more jurisdictions are not jeopardized or prejudiced. There has been no showing by Petitioner Young that the state prosecuting authorities were ever aware of his presence in the Pulaski County Jail during the 33 days in question. The record is completely void as to the particular number of days petitioner was in actual attendance in federal court, nor is there any indication of the number of days petitioner was engaged in actual preparation for his trial in federal court. These days would have to be subtracted from the total 33 in order to ascertain exactly when petitioner would have theoretically been available to stand trial on the state charges. Even so, there has been no showing that the state trial docket in Pulaski County Circuit Court was such as to accommodate these dates. The speculation and uncertainty in petitioner's argument that physical presence within the geographic confines of the demanding jurisdiction is sufficient under Article VI render the contention without merit. The Court, therefore, finds that the 33-day time period tolled the running of the 180-day limitation period and is excluded from the computation of that period within the meaning of Article III of the Agreement. By so holding, the expiration of the 180 days, counting from the date notice was received, falls on May 9, 1978 and the May 3 trial date was clearly within the time period petitioner should have been brought to trial to preclude a violation of Article III. Accordingly, petitioner has failed to show that the State of Arkansas failed to comply with the speedy trial provisions set forth in that section of the Agreement.

### D.

■ Had this Court found otherwise, *i. e.,* that there had been a technical violation of the statutory time limit contained in Article III, that result, under the circumstances *seriatim* of this case, would not have been such a fundamental defect which would entitle petitioner to habeas corpus relief under Section 2254. This Court agrees with respondent's argument that any violation of Article III does not automatically require dismissal of the charges and release of a habeas corpus petitioner. Petitioner Young must not only show a clear violation of the statute but also that he was prejudiced as a direct result of the violation.

■ Without the exclusion of the 33-day tolling period, the 180-day time limit expired on April 5, 1972. Less than a month later, on May 1, 1972, petitioner appeared with his attorney and a trial date on the state charges was set initially for May 3. Other than petitioner's testimony at the hearing, in which he stated that it was not the lodging of the detainer that caused a problem but the fact that he could not get a job on the outside, there has been no evidence or argument that petitioner was prej-

udiced in any way by the delay of less than a month before his initial appearance in state court.

The Court is cognizant of the holding in *United States v. Ford, 550 F.2d 732 (2d Cir. 1977), aff'd sub nom. United States v. Mauro, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978)* that, under the mandatory dictates of Article V(c) [4] of the Agreement, the violation there of Article IV warranted reversal. However, appellant Ford made a direct attack on his confinement while in the case at bar, Petitioner Young has attacked his confinement collaterally by a Section 2254 habeas corpus proceeding. Accordingly, in the absence of a more definitive ruling on this issue, this Court finds that Petitioner Young has failed to satisfy the 'cause-and-prejudice' standard which has been "incorporated directly into the body of law governing the availability of federal habeas corpus review." *Wainwright v. Sykes, 433 U.S. 72, 85, 97 S.Ct. 2497, 2505, 53 L.Ed.2d 594 (1977). Cf., Williams v. State of Maryland, supra,* where there was no suggestion that the delay was caused by the deliberate inaction by the State, and that no miscarriage of justice resulted from bringing petitioner to trial only slightly in excess of 180 days from his request for trial.

## II.

■ In his pro se petition under Point II, it is contended that petitioner's rights to due process and equal protection under the Fourteenth Amendment have been violated because ". . . the State knowingly, willfully and maliciously, allowed its key witness to give perjurous testimony at the trial to show that the property in question was [worth] in excess of thirty-five dollars $35.00)."

The record reflects that petitioner was charged with the unlawful possession of stolen property, S & H Green Stamp books, the aggregate value of which was greater than $35.00, a violation of Ark.Stat.Ann. Sec. 41–3938 (Repealed). The value differential of $35.00 is the determining point for whether the criminal activity is a felony or misdemeanor. Petitioner has based his contention on the allegation that fourteen books were found in his possession and that there are certain affidavits which reflect that the value of each book was $2.00, making the aggregate value total $28.00, thus rendering the offense charged a misdemeanor.

For alleged perjured testimony to be a sufficient ground for federal habeas corpus relief, petitioner must establish that the questioned testimony was false, material and knowingly and intentionally used by the State to obtain a criminal conviction. *Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).* No evidence to this effect was presented at the hearing nor in the stipulation, and the issue was not briefed by petitioner's counsel.

In reviewing the transcript, the Court notes that 35 stamp books, all filled with stamps, were introduced at the state trial (14 recovered from the Redemption Center and 21 recovered from petitioner's home), and that the testimony given by the Manager of the S & H Redemption Center was that one filled stamp book was worth $3.00 in merchandise. The affidavits supporting petitioner's allegation that the cash surrender value of each book was $2.00 consist of certain letters of correspondence attached to his pro se pleading styled "Petitioner's Traverse to Respondent's Response to Writ of Habeas Corpus," which were not introduced into evidence.

Nevertheless, petitioner's allegation is of little consequence since, no matter which value is used, the aggregate value of 35 filled stamp books clearly exceeds $35.00 as required by the statute for the offense to

---

4. Article V(c) provides in pertinent part:

[I]n the event that an action on the indictment, information or complaint on the basis of which the detainer has been lodged is not brought to trial within the period provided in Article III or Article IV hereof, the appropriate court of the jurisdiction where the indictment, information or complaint has been pending shall enter an order dismissing the same with prejudice, and any detainer based thereon shall cease to be of any force or effect.

constitute a felony. Petitioner's allegation under Point Two is without merit.

### III.

Petitioner's final contention is that certain evidence seized after he had been placed under an allegedly illegal arrest, and pursuant to an allegedly illegal search of his home without probable cause should have been suppressed and not used as evidence to convict.

The State trial record reflects that the Manager of the S & H Green Stamp Redemption Center took the license number of the car driven by two persons while they were in the Center purchasing items using stamps the store personnel had been notified were stolen. The Manager relayed this information to the police and they consequently went to the home of petitioner and his wife and asked petitioner to come to the station for investigatory questioning. While in petitioner's home, the police saw some S & H Green Stamp books lying openly on the mantle. While at the station, petitioner refused to consent to the search of his home and thereafter, the police obtained a search warrant, conducted a search of petitioner's home and recovered the stamp books they had seen. The books were subsequently introduced into evidence at the pre-trial suppression hearing and determined to be the stolen books.

 The fact that petitioner was arrested illegally, without more, would not vitiate his conviction. *Novak v. Swenson, 357 F.Supp. 901 (E.D.Mo.1973) aff'd 489 F.2d 760 (8th Cir. 1973).* Furthermore, where a state prisoner had had the opportunity for full and fair consideration of a claim based on the exclusionary rule regarding seized evidence, he may not be granted habeas corpus relief on the ground that evidence seized pursuant to an unconstitutional search or seizure was introduced at trial. *Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed. 1067 (1976), reh. denied 429 U.S. 874, 97 S.Ct. 197, 50 L.Ed.2d 158.*

 In the instant case, the state record reflects that this contention was litigated at

the trial during the suppression hearing, and was raised on appeal. Both resulted in the issue being decided adversely to the petitioner.

 Nevertheless, this Court finds the circumstances surrounding the search of petitioner's home and the subsequent seizure of the incriminating stamp books constituted probable cause that a crime had been committed. "Probable cause exists when 'the facts and circumstances within their [the arresting officers'] knowledge and of which they had reasonable trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been committed." *Novak v. Swenson, supra,* at 904, citing *Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).*

In the instant case, the police officers were acting on reliable information supplied to them by the Manager of the Redemption Center who had personally observed petitioner and his wife purchase items with the stolen books of stamps. The officers saw the books in question lying in their plain view and at a time when they had gained entry into petitioner's home with his permission. No action was taken to seize the books until petitioner refused to grant the officers permission to search his home and a warrant was thereafter obtained to do so. The Court notes that petitioner has not challenged the sufficiency of the application for the warrant, the issuance of the same nor the return made subsequent to its execution.

In light of all these circumstances, the Court must find that petitioner has failed to assert any ground hereunder which would entitle him to habeas corpus relief.

In accordance with the foregoing reasons set forth in this memorandum opinion, the Clerk is directed to enter the appropriate Order denying petitioner's motion for habeas corpus relief.